UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| IN RE: SOUTHEASTERN MILK ) | |
| ANTITRUST LITIGATION ) | |
| ) | Master File No. 2:08-MD-1000 |
| ) | |
| THIS DOCUMENT RELATES TO: ) | Judge J. Ronnie Greer |
| *Sweetwater Valley Farm, Inc., et al. v.* ) | |
| *Dean Foods Co., et al.,* No. 2:07-CV- 208. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the "Dairy Farmer Plaintiffs' Motion For Final Approval of Class Action Settlement With Defendants Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, Mid-Am Capital, LLC, National Dairy Holdings, LP, and Gary Hanman," the ("Settling Defendants") [Doc. 1933]. This Court previously found the proposed settlement "sufficiently fair, reasonable and adequate" and preliminarily approved the settlement on January 22, 2013, [Doc. 1923]. After the preliminary approval of the settlement by the Court, plaintiffs caused notice of the settlement to be provided in accordance with the procedure approved by the Court. This Court then conducted a fairness hearing on April 3, 2013, and the matter is now ripe for disposition. For the reasons which follow, the motion will be GRANTED and the Court will enter judgment as to the Settling Defendants.[1]

## I. The Settlement Agreement

---

[1] This Court previously gave final approval to a class action settlement between Dairy Farmer Plaintiffs and Dean Foods Company, Southern Marketing Agency, Inc. and James Baird, [Doc. 1889], and entered final judgment against those defendants, [Doc. 1892]. This settlement includes all remaining defendants and will terminate this litigation in this Court.

This multi-district class action antitrust case has now been pending for more than five years. After vigorous litigation and arms length negotiations, the plaintiffs and the Settling Defendants have entered into a settlement agreement. Under the terms of the agreement, the Settling Defendants will make settlement payments totaling $158,600,000. Of that amount, $140,000,000 was paid into a settlement escrow fund within 15 days of the Court's preliminary approval of the settlement. Settling Defendants will pay the remaining $18,600,000 into the settlement escrow fund in 2014 and 2015, which will guarantee Settling Defendants' promise to increase uniform milk prices payable to farmers in Orders 5 and 7 by at least $9,300,000 in each of those years. If uniform prices do not increase by at least $9,300,000 each year, funds will be disbursed from escrow for payment to the class members in proportion to the shortfall.

In addition, the Settling Defendants have also agreed to implement more than a dozen changes to how they conduct their business in the Southeast. Pursuant to the agreement:

- Dairy Farmers of America, Inc. ("DFA") will increase Class I utilization by reducing or eliminating milk shipped to one or more facilities in Orders 5 and 7 where milk is currently processed for Class III usage, pursuant to Settling Defendants' guarantee to increase uniform prices in those Orders by $9.3 million per year.

- DFA will remove monetary penalties for cancellation of full-supply agreements for Country Delite in Nashville and Ryan Foods in Murray.[3] Also, DFA will not, during the term of the agreement, enter into any other full-supply agreements with bottling plants in Orders 5 or 7.

- In addition to all discovery materials previously made public, Settling Defendants agree to release the materials previously agreed in filings at Docket Nos. 1829 and 1848.

- DFA will insert the following language in membership agreements for Orders 5 and 7 members: "However, this Agreement may be terminated by either party during the

2

ninety (90) day period immediately prior to the Anniversary Date by giving at least thirty (30) days written notice to the other party. The termination will be effective on the Anniversary Date unless otherwise modified, at the request of the member, for a period not to exceed fifteen days after the Anniversary Date to accommodate members' particular milk marketing needs."

- DFA will reconfigure checks for Orders 5 and 7 members to reflect revenues received/proceeds available to pay, agency and cooperative deductions, each shown as an average per hundredweight of milk, and the individual member's applicable premiums, incentive payments, and mailbox price. Also, the checks will show the average Federal Order blend price for each member's pay zone.

- DFA financial reports will be prepared in accordance with generally accepted accounting principles, and DFA will be audited by a nationally-recognized accounting firm.

- DFA senior management and Audit Committee members will affirmatively represent they are responsible for the preparation, integrity and accuracy of DFA's annual financial report.

- DFA will post on its member-only website an annual disclosure of all material related-party transactions, specifically broken out and identified by transaction.

- At its annual meeting, DFA will disclose to its delegates all material related-party transactions as well as DFA's financial results from its participation in joint ventures and off-balance sheet transactions, specifically broken out and identified by transaction.

- DFA will disclose the identity of the members of its board of directors and its committees and their generally applicable *per diem* payment rate compensation.

- DFA senior executive management and board members will execute annual conflict of interest certifications, which will be subject to review by DFA's Audit Committee and a report by the Committee at DFA's annual meeting.

3

- DFA will facilitate a vote by its delegates on resolutions considering whether: (1) DFA should annually disclose its top five senior executives' compensation and incentives; (2) DFA members should be allowed to opt out of DFA's block vote; and (3) delegates and candidates to be delegates may obtain a list of DFA members in their districts. For each resolution, DFA's CEO will provide a neutral presentation as to the pros and cons as part of DFA's communications to delegates regarding its annual meeting. In addition, DFA's Southeast Area Council will provide to its members the text of the CEO's pros and cons as well as the names and contact information for the council member and delegate from each member's district who will be attending the annual meeting at which the resolutions will be considered.

- Compliance with the Agreement will be monitored by DFA's Audit Committee, and the Committee will report its views to the delegates at DFA's annual meeting.

In exchange for the monetary and other relief, class members, consisting of the independent farmer subclass certified on September 7, 2010, [Doc. 934], and the DFA member subclass, certified on September 7, 2010, and reinstated on June 1, 2013, [Doc. 1878], will release the Settling Defendants and Gerald Bos[2] of any claims that have been asserted, or could have been asserted, arising out of or relating in any way to any conduct alleged in the complaint.

## II. Analysis

The Court's January 22 order provided for notice to the class in accordance with the Court's order. On February 1, 2013, Rust Consulting sent the Court-approved class notice via United States Mail, postage prepaid, to 7,730 distinct names and addresses of potential class members identified from defendant and third-party information, published the summary class notice in the March, 2013, issue of *Hoard's Dairymen*, posted documents and information pertinent to the settlement on the

---

[2] The Court previously granted Bos's motion for summary judgment and dismissed the plaintiffs' claims against him, [*see* Doc. 1639].

4

class action and notice website, and established a toll-free telephone number. By the Court established deadline of March 20, 2013, 7,143 timely claim forms and one request to opt back into the class were received and processed. Once the claim processing procedure is completed, plaintiffs will submit a proposed plan of allocation of the settlement proceeds for the Court's approval.

In order to approve a proposed settlement, the Court must first determine if that settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). Relevant factors to be considered by the Court in that approval process include: (a) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense, and delay of further litigation; (c) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e) whether the settlement is fair to the unnamed class members; (f) objections raised by class members; (g) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and (h) whether the settlement is consistent with the public interest. *Williams v. Vukovich,* 720 F.2d 909, 922-23 (6th Cir.1983) *In re Cardizem CD Antitrust Litigation,* 218 F.R.D. 508, 522 (E.D.Mich.,2003) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir.1992); *Kogan v. AIMCO Fox Chase, L.P.,* 193 F.R.D. 496, 501-02 (E.D.Mich.2000); *Steiner v. Fruehauf Corp.,* 121 F.R.D. 304, 305-06 (E.D.Mich.1988)).

When evaluated under the foregoing standards, the Court FINDS that the proposed settlement is a "fair, reasonable, and adequate" resolution of this very complex class action case for the reasons that follow.

    **A.**    **Likelihood of Plaintiffs' Success on the Merits Weighed Against the Amount and Form of Relief Offered in the Settlement**

5

The fairness of each settlement turns in large part on the strength of the parties' legal dispute. "Although this inquiry understandably does not require [the court] to 'decide the merits of the case or resolve unsettled legal questions,' [the court] cannot 'judge the fairness of a proposed compromise' without 'weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.'" *International Union, United Auto., Aerospace, and Agr.Implement Workers of America v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14 (1981)).

As noted above, this settlement offers the class substantial and certain benefits, including monetary payments in the total amount of $158,000,000. The monetary recovery for each class member is likewise substantial, amounting to an estimated average payment, as with the prior settlement, of approximately $13,000 per farm, after deducting the requested fees and expenses. The total settlement allows class members to recover nearly forty percent of the total amount of damages claimed on behalf of the class, before trebling, estimated by plaintiffs' expert Dr. Gordon Rausser to be approximately $415,000,000. When combined with the prior settlement referenced above ($140,000,000), the class will recover over seventy percent of the estimated damages.

Further, the agreement provides to class members significant and valuable non-monetary benefits which likely go beyond the extent of structural relief which could have been ordered by the Court in the event of an injunction after successful prosecution of the case by the plaintiffs at trial. These non-monetary benefits address concerns raised by at least one objector to the prior settlement and, given this Court's intimate knowledge after five years of litigation of the issues raised by the case, are likely to meaningfully change the way milk is marketed in the Southeastern United States.

This Court has previously observed that the "parties face enormous risk if the case is tried,"

6

[Doc. 1735 at 2], and there is little question that continued litigation of this case would be fraught with risk. Given the complexity of the issues in the litigation and their hotly contested nature, as well as the inherently unpredictable nature of a jury trial, there is clearly a risk that plaintiffs would receive little or nothing at trial. All litigation poses such risks of course but antitrust litigation especially so. Weighing the amount, form and certainty of the relief offered in the settlement agreement against plaintiffs' likelihood of success on the merits at trial preponderates heavily in favor of the fairness of the proposed settlement.

### B. The Risks, Expense and Delay of Further Litigation

In general, "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them." *In re Telectronics Pacing Sys., Inc.,* 137 F.Supp.2d 985, 1013 (S.D. Ohio 2001) (quoting *In re Austrian and German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 174 (S.D.N.Y.2000)). This case is no different and its complexity was enhanced by somewhat novel factual and legal issues which have been hotly contested and aggressively litigated by all parties. Here, the possible difficulties Plaintiffs would encounter in proving their claims, the substantial litigation expenses, and the almost certain delay in recovery due to the appellate process, provide justification for this Court's approval of the proposed settlements. *Wess v. Storey*, 2011 WL 1463609, * 3 -4 (S.D.Ohio,2011).

Plaintiffs' counsel have now incurred roughly $8,000,000 in out-of-pocket expenses for the investigation and preparation of this case. The parties had estimated that approximately two months would be required for the trial of the case. Clearly, preparation and trial of this case for nearly two months would require substantial additional effort on the part of counsel who have been involved in this litigation, as noted above, for more than five years and substantial additional expenses.

Furthermore, the likelihood of an appeal was great, further adding to the risks, expense and delay of further litigation. The Court agrees with plaintiffs that the immediate recovery of substantial monetary and structural relief provided by the settlement far outweighs the risk and commitment of time inherent in further litigation of this complex matter, especially in view of the risks, expenses and delays noted above.

### C. Recommendations of Experienced Counsel and Class Representatives

The judgment of experienced counsel and class representatives regarding the settlement should be given significant weight. *See Kogan*, 193 F. R. D. at 502. Plaintiffs here have been represented by well qualified attorneys with extensive experience in litigating and settling complex class action antitrust actions and the class representatives are experienced Southeast dairy farmers and leaders. Their collective judgment that the settlement is in the best interest of class members weighs heavily in favor of the Court's final approval of the agreement. This Court has seen first hand the nature and quality of the work done by plaintiffs' counsel over the last five years and has noted their experience and competence on numerous occasions in prior orders. This Court does, indeed, credit their recommendation, along with the class representatives, as a substantial factor in favor of approval of the agreement.

### D. The Amount of Discovery Completed and the Character of the Evidence Uncovered

In its order approving the prior settlements, the Court noted the extensive and significant nature of the discovery completed in the case. Counsel reviewed, analyzed, and organized over five million pages of documents from the defendants and over 95,000 pages produced by third parties. Plaintiffs took eighty (80) depositions of fact witnesses and defendants took thirty (30). Extensive expert discovery involving class certification and merits were conducted by both sides. There was

8

extensive motion practice in the case, including numerous discovery motions. In other words, this settlement comes on the eve of trial at a time when the class representatives and counsel are thoroughly familiar with the evidence and are in the best position to realistically evaluate the strengths and weaknesses of their case. Counsel's recommendation and that of the class representatives is clearly supported by an incredibly extensive base of data and this gives added weight and deference to the judgment of trial counsel and the class representatives.

### E. Whether the Settlements are Fair to Unnamed Class Members

As noted above, notice was sent to 7,730 potential class members and ninety-two percent of them have responded by filing timely claim forms. As plaintiffs point out, this is an extraordinarily high response rate and is compelling proof of the adequacy of the settlement. *See Newberg On Class Actions § 11.41*; *see also In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *13 (E.D. Mich. Dec. 13, 2011). Furthermore, the settlement's monetary payments will be distributed to all class members according to their volume of milk production and sales, as it was with the prior settlement, and *pro rata* treatment is presumptively fair across the class. *See In re Airline Ticket Com'n Antitrust Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997). Also, the settlement's conduct terms are equally available and/or applicable to all class members in both subclasses, as well as those dairy farmers who are not part of the settlement agreement. The overwhelming positive class response highlights the fairness of the settlements to unnamed class members and weighs in favor of approval of the settlement.

### F. Objections Raised by Class Members

No class member objected to the terms of the agreement, a fact which further demonstrates the fairness of the settlement. Not only were there no objections, numerous class members and class

9

representatives appeared in person at the fairness hearing and spoke to the Court in favor of the settlement. The Court received letters from three class members and none objected to the settlement agreement. In addition, the Court received a letter from an SMA board member who has been excluded from the class; nevertheless, he asked to be permitted to participate in the settlement, an implicit endorsement of the agreement.

The lack of objections by class members in relation to the size of the class highlights the fairness of the settlements to unnamed class members and supports approval of the settlements. *In re Cardizem*, 218 F.R.D. at 527. *See also In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) (observing that "[i]n litigation involving a large class, it would be 'extremely unusual' not to encounter objections."). As noted in the Court's order approving the prior settlement, [Doc. 1889 at 9], the Court noted that the sole objection to those settlement agreements came from a class member who did not object to the reasonableness of the monetary settlement but who argued that various elements of "structural" relief should be included in those settlement agreements. As noted above, much of the structural relief sought by that objector has now been provided through the non-monetary benefits of this agreement.

### G. Whether the Settlement is the Product of Arms Length Negotiations as Opposed to Collusion

The settlement agreement before the Court has been arrived at after the parties' claims and defenses have been subjected to an intense and lengthy adversarial process. "Courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *In re Packaged Ice*, 2011 WL 6209188, at *14 (quoting *International Union v. Ford Motor Company*, 2006 WL 1984363, at *26 (E.D. Mich. July 13, 2006). Here, there is absolutely no evidence of fraud or collusion. On the contrary, settlement negotiations

10

between Plaintiffs and Settling Defendants came after more than five years of vigorous litigation, were conducted over many months, and the settlement was ultimately arrived at after extensive involvement by the court appointed mediator in this case, W.J. Michael Cody, a former Tennessee Attorney General. This factor clearly weighs in favor of approval of the settlement.

### H. Whether the Settlement is Consistent with the Public Interest

It is beyond dispute that there is a public interest in settlement of disputed cases that require substantial federal judicial resources to supervise and resolve. This Court has already expended numerous resources and substantial time to the supervision of this litigation. It was set for a two month long trial before this Court and a jury. The proposed settlement ends potentially long and protracted litigation among these parties and frees the Court's valuable judicial resources. *See In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 376 (S.D. Ohio, 2006). This factor weighs in favor of approval of a proposed settlement and clearly serves the public interest.

## III. Conclusion

After reviewing the relevant factors, the Court FINDS that the settlement agreement is "fair, adequate and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.,* 908 F.2d 38,42 (6th Cir. 1990). The Court therefore GRANTS dairy farmer plaintiffs' motion for final approval of their class action settlement with defendants Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, Mid-Am Capital, LLC, National Dairy Holdings, LP and Gary Hanman and APPROVES THE SETTLEMENT AGREEMENT.

A separate order will issue and the Clerk will be DIRECTED to enter final judgment.

ENTER:

                                                          s/J. RONNIE GREER
                                           UNITED STATES DISTRICT JUDGE